Chadrow, Exr., *v.* Kellman, Appellant.

Argued April 13, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and AR-NOLD, JJ.

*Edwin P. Rome,* with him *Julian E. Goldberg* and *Gray, Anderson, Schaffer & Rome,* for appellant.

*Harry B. Berk,* with him *Morris B. Levitt,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 28, 1954:

Appellant is the claimant of the contents of a safe deposit box in the joint names of a decedent and her own. The court below ruled that claimant did not establish ownership of the contents under a valid *inter vivos* gift since there was no delivery, actual or constructive, sufficient to divest donor of all dominion over such property and invest donee with ownership, possession or control. The appeal followed.

The hearing judge made the following findings of fact, which are not disputed:

"On May 4, 1950, William Chadrow [decedent] rented a safe deposit box, No. D1777, in the Gimbel Brothers Bank and Trust Company of Philadelphia, at which time two keys for the said deposit box were delivered to him by the bank with access to said box restricted to him.

"At this time the said William Chadrow was a widower residing at 4517 Old York Road, Philadelphia.

"At the said time Jennie Kellman, the defendant, [appellant] was a niece of the said William Chadrow and resided at 725 W. Moyamensing Avenue, Philadelphia.

"For some time subsequent to the death of his wife on November 11, 1950, the said William Chadrow visited the home of the defendant three or four times a week where he ate his evening meals prepared by her, at no cost to him.

"On June 20, 1951, the said William Chadrow informed his niece, the said defendant, that the next day he would take her to the Gimbel Brothers Bank and Trust Company to make her the joint owner of the contents of the safe deposit box in that bank.

"On June 21, 1951, the said William Chadrow and the defendant, Jennie Kellman, went to the Gimbel Brothers Bank and Trust Company where he and she signed and executed a joint tenancy agreement which was on a form prepared by the said bank.

"The Joint Tenancy Agreement, as executed by the said William Chadrow and Jennie Kellman, on June 21, 1951, is as follows: 'Gimbel Brothers Bank and Trust Company is hereby authorized and instructed to permit access to said box by any (or either) of the undersigned and to recognize such deputy or deputies as any (or either) of the undersigned may appoint as the deputy or deputies of all. It is agreed that each (or either) of the undersigned is the joint owner of

the present and future contents of said box, and that in the event of death of any (or either) of the undersigned, the survivors or survivor shall have the right to withdraw said contents, and upon said withdrawal said bank shall be automatically relieved of any further obligation or responsibility to the heirs, legatees, devisees, or legal representatives of the deceased.' (Signed William Chadrow, Jennie Kellman.)

"In a rider attached to said contract it was stated: 'I hereby acknowledge to have received two keys to Box 1777 in the Safe Deposit Department of Gimbel Brothers Bank and Trust Company and agree to be bound by rules and regulations appearing above.' This rider was executed by Wm. Chadrow and Jennie Kellman.

"During the lifetime of the said William Chadrow he alone exercised the right of access to the said safe deposit box.

"The said Jennie Kellman never had possession of a key to the said box.

"On November 18, 1952, the said William Chadrow died.

"At that time, the contents of the said safe deposit box consisted of a Last Will and Testament executed by the said William Chadrow, dated January 8, 1949 (which was admitted to probate by the Register of Wills of Philadelphia County on January 21st, 1953, granting Letters Testamentary to the plaintiff as executor) and the sum of $3,180 in cash.

"The said Gimbel Brothers Bank and Trust Company refused to turn over the said cash in the sum of $3,180 to either the plaintiff or the defendant until the matter is adjudicated by the Court.

"The said decedent never intended to make an immediate gift inter vivos of the contents of his safe de-

posit box so that the defendant would have immediate dominion over the contents of the box.

"The said decedent retained dominion over the contents of the said safe deposit box during his lifetime.

"The said decedent intended to transfer the property contained in his safe deposit box to the defendant to take effect upon his decease but not before."

These findings of fact, which are amply supported by the testimony, establish that claimant never possessed a key to the box, never had access thereto, and that the decedent kept exclusive possession of both keys and solely exercised right of access.

If, as the learned court below found, the decedent intended that any transfer of title was not to be effective until his death, such transfer would constitute a *donatio mortis causa*. Such a gift is defined as one made by a person in his last illness, or in *periculo mortis*, subject to the implied conditions that if the donor recover, or if the donee die first, the gift shall be void: *Michener v. Dale*, 23 Pa. 59; *Gourley v. Linsenbigler*, 51 Pa. 345. There is not the slightest semblance, under the facts in this case, to a gift *mortis causa*. Unless this constitutes a valid gift *inter vivos* the fund forms part of decedent's estate. The distinguished Orphans' Court Judge, CLEMENT B. PENROSE, whose opinion is quoted in *Walsh's Appeal*, 122 Pa. 177, 15 A. 470, stated the difference in character of gifts *mortis causa* and *inter vivos*. He said (p. 180):

"The requisites of a gift mortis causa are, that it be made in view of impending death; that by express provision or necessary implication, it is to become inoperative if the anticipated death does not take place or if the donee should die previously; and that the intention of the donor to complete the gift be shown by actual delivery of its subject and the surrender of all dominion over it. *It is not however essential, as it*

*is in gifts inter vivos . . ., that the legal title of the donor should be completely divested. 'No court of equity,' said Lord Eldon, in Duffield v. Elwes, supra, 'will compel the completion of gifts inter vivos, and . . . the donor is considered as a party who may refuse to complete the intent he has expressed; . . .'* " (Italics supplied)

In *Walsh's Appeal*, supra, it was also said (p. 186) : "A gift is more than a purpose to give, however clear and well settled the purpose may be. It is a purpose executed. It may be defined as the voluntary transfer of a chattel completed by the delivery of possession. *It is the fact of delivery that converts the unexecuted and revocable purpose into an executed and therefore irrevocable contract.* All gifts are necessarily inter vivos, for a living donor and donee are indispensable to a valid donation; but when the gift is prompted by the belief of the donor that his death is impending, and is made as a provision for the donee, if death ensues, it is distinguished from the ordinary gift inter vivos and called donatio mortis causa. But by whatever name called the elements necessary to a complete gift are not changed. There must be a purpose to give; this purpose must be expressed in words or signs; and it must be executed by the actual delivery of the thing given to the donee or some one for his use. In every valid gift a present title must vest in the donee, irrevocable in the ordinary case of a gift inter vivos, revocable only upon the recovery of the donor in gifts mortis causa: Wells v. Tucker, 3 Binn. 366; Nicholas v. Adams, 2 Wh. 17; Bacon Ab., vol. 6, p. 162, . . ." (Italics supplied)

This doctrine has been consistently reaffirmed over many years. We have repeatedly held that an essential component element of a valid *inter vivos* gift is that there must be evidence of an intention to make

a *gift* accompanied by *delivery, actual or constructive, of a nature sufficient not only to divest the donor of all dominion over the property, but to invest the donee with complete control*: *Henderson v. Hughes,* 320 Pa. 124, 126, 182 A. 392; *Fitzpatrick v. Fitzpatrick,* 346 Pa. 202, 206, 29 A. 2d 790; *Tomayko v. Carson,* 368 Pa. 379, 383, 83 A. 2d 907; *Kerwin Estate,* 371 Pa. 147, 159 et seq., 89 A. 2d 332, and the many cases cited therein.

Cases relating to *inter vivos* gifts of interests in *bank accounts* differ from cases involving gifts of contents of safe deposit boxes. In the latter case access may only be had by means of a *key.* The donee cannot secure possession unless he has a key to unlock the box and take possession of the contents or of the portion which was given to him. Where a depositor in a bank, however, adds the name of and executes an agreement with a donee, under which either might draw from the fund, in whole or part, and the agreement contains *words of an absolute transfer and gift* and provides that upon the death of either the survivor becomes the sole owner, such transaction constitutes a valid *inter vivos* gift. In such case the delivery is actually made *since the donee may forthwith withdraw the fund*: *Mardis v. Steen,* 293 Pa. 13, 141 A. 629; *Reap v. Wyoming Valley Trust Co.,* 300 Pa. 156, 150 A. 465; *Mader v. Stemler,* 319 Pa. 374, 179 A. 719; *Culhane's Estate,* 334 Pa. 124, 5 A. 2d 377; *Fell Estate,* 369 Pa. 597, 87 A. 2d 310; *Furjanick Estate,* 375 Pa. 484, 100 A. 2d 85. Where, however, a bank account is opened with donor's own money and the only right conferred is to *withdraw money,* there is no *inter vivos gift* with right of survivorship: *Flanagan v. Nash,* 185 Pa. 41, 39 A. 818; *Zellner's Estate,* 316 Pa. 202, 172 A. 715; *Romig v. Denkel,* 326 Pa. 419, 192 A. 657; *Kata Estate,* 363 Pa. 539, 70 A. 2d

351. The mere handling of a bank book, though accompanied by words showing an intention of making a gift, is not a sufficient *delivery* to constitute a valid gift of the account: *Walsh's Appeal*, 122 Pa. 177, 15 A. 470; *Grigonis's Estate*, 307 Pa. 183, 160 A. 706; *Kata Estate*, supra; *Estate of Lewis H. Eshenbaugh, Deceased*, 114 Pa. Superior Ct. 341, 174 A. 809.

Tentative trusts need not be considered herein as this doctrine has never been extended to any property other than a savings account, where the donor with his own money opens such an account in his own name *in trust* for the donee: *Ingels Estate*, 372 Pa. 171, 177, 92 A. 2d 881, and the many cases therein cited.

It, therefore, follows that in order to make a valid *inter vivos* gift of the contents of a safe deposit box there must be an actual delivery of the contents, or the delivery of a key to the box, to divest donor of his dominion over the property and invest the donee with ownership, possession and control. Where the claimed *inter vivos* gift is of a bank account, the gift is not completed unless, upon the opening of the account, it constitutes *a gift of the fund* which entitles the donee to withdraw the deposit in whole or part. Such an account cannot be changed without the consent of the donee. The question of what sums each could *withdraw* is not herein involved.

In applying these principles to the case now before us, decedent and claimant, on May 4, 1950, signed a printed document furnished by the bank, reading as follows:

"JOINT-TENANCY AGREEMENT

"GIMBEL BROTHERS BANK AND TRUST CO., is hereby authorized and instructed to permit access to said Box, by any (or either) of the undersigned, and to recognize such deputy or deputies as any (or either) of the undersigned may appoint as the deputy or depu-

ties of all. It is agreed that each (or either) of the undersigned is joint owner of the present and future contents of said Box, and that in the event of death of any (or either) of the undersigned, the survivors or survivor shall have the right to withdraw said contents, and upon said withdrawal said Bank shall be automatically relieved of any further obligation or responsibility to the heirs, legatees, devisees, or legal representatives of the deceased." It is conceded that decedent alone received and kept both keys to the box and that claimant never had possession of either key and never had access to the box. The testimony of a bank vault custodian is most significant. She testified that on November 13, 1952, decedent came to the vault and inquired how he could return the box to his own name. She told him that the only way in which to accomplish this was to surrender the old box and open a new one, and *that since he possessed both keys no one except himself could gain entry.* When decedent learned that the surrender of the old box and the opening of a new one would cost more money, he decided to wait until the expiration of the year for which he had prepaid the box. Decedent was informed that since he possessed both keys he could surrender the box at his pleasure without joinder of claimant.

It follows that since claimant never had access to the safe deposit box, the donor did not divest himself of dominion over the property claimed and did not invest claimant with ownership, possession or control. The gift consequently fails.

Decree affirmed at cost of appellant.

DISSENTING OPINION BY MR. CHIEF JUSTICE HORACE STERN:

I dissent in this case because I am of opinion that when the niece, Jennie Kellman, joined with the dece-

dent, in his presence, in acknowledging that she and he had received the keys to the safe deposit box, this constituted a delivery of them by the Gimbel Bank to her as well as to him, and that, when he took possession of the keys, it is fairly to be presumed that it was only to hold one of them as custodian for her. Therefore I think that under the facts of this case there *was* a delivery of a key to the niece, and that consequently all the requisites of a gift inter vivos were present in the transaction.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

Jennie Kellman, a niece of the decedent (William Chadrow), claims the contents of a safe deposit box, namely, $3180. in cash, of which box she and the decedent were joint owners with right of survivorship. Irrespective of whether the principles governing an inter vivos gift are applied, or whether the principles of contract law are applied (as I am convinced they should be), Jennie is and from June 21, 1951, the date of the gift or contract, undoubtedly was a joint owner of the contents of the box with right of survivorship.

The auditing Judge found the following pertinent facts: "On May 4, 1950, William Chadrow rented a safe deposit box, No. D1777, in the Gimbel Brothers Bank and Trust Company of Philadelphia, at which time two keys for the said deposit box were delivered to him . . .

"On June 20, 1951, . . . Chadrow informed his niece . . . that the next day he would. take her to the Gimbel Brothers Bank and Trust Company *to make her the joint owner** of the.contents of the safe deposit box in that bank.

---

* Italics, ours.

"On June 21, 1951 . . . Chadrow and . . . Jennie Kellman, went to the Gimbel Brothers Bank and Trust Company *where he and she signed and executed a joint tenancy agreement* which was on a form prepared by the said bank.

"The Joint Tenancy Agreement, as executed by the said William Chadrow and Jennie Kellman, on June 21, 1951, is as follows: 'Gimbel Brothers Bank and Trust Company is hereby authorized and instructed to permit access to said box by any (or either) of the undersigned and to recognize such deputy or deputies as any (or either) of the undersigned may appoint as the deputy or deputies of all. It is agreed that *each* (or either) *of the undersigned is the joint owner of the present and future contents of said box,* and that in the event of death of any (or either) of the undersigned, the survivors or survivor shall have the right to withdraw said contents, and upon said withdrawal said bank shall be automatically relieved of any further obligation or responsibility to the heirs, legatees, devisees, or legal representatives of the deceased.' (Signed William Chadrow, Jennie Kellman.)

"In a rider attached to said contract it was stated: 'I hereby acknowledge to have received two keys to Box 1777 in the Safe Deposit Department of Gimbel Brothers Bank and Trust Company and agree to be bound by rules and regulations appearing above.' This rider was executed by William Chadrow *and Jennie Kellman.*

"During the lifetime of the said William Chadrow he alone exercised the right of access to the said safe deposit box."

The chancellor further found that Jennie Kellman never had *actual* possession of a key to the said box. The majority opinion rules that this would have been a valid inter vivos gift *if Jennie had actual possession*

*of one* of the box keys for the receipt of which she actually signed. The majority has overlooked the fact that all the authorities upon which they rely hold that a *constructive* delivery is sufficient and hence their conclusion that this was not a valid gift, in my opinion, is unsupportable.

We shall first analyze and discuss the principles of law which we and the majority respectively believe are applicable, in the light of all of the *genuine* findings of fact of the auditing or hearing Judge, none of which we dispute. However, we point out what the majority has completely overlooked, namely, appellate Courts are not bound by the lower Court's deductions or conclusions, or its findings on mixed questions of fact and law, but have the power to make their own deductions and conclusions from the facts, and their own findings or conclusions on questions of mixed fact and law, and, of course, their own conclusions of law.

In *Peters v. Machikas,* 378 Pa. 52, 105 A. 2d 708, the Court said: "Findings of fact made by a Chancellor who saw and heard the witnesses, when confirmed by the Court en banc, will not be reversed on appeal if they are supported by adequate evidence: Pregrad v. Pregrad, 367 Pa. 177, 80 A. 2d 58; Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729. However, that well-settled principle is confined to findings which are true and genuine findings of fact. 'With respect to [a] inferences and deductions from facts and [b] conclusions of law, both the Court en banc and the appellate Courts have power to draw their own inferences and make their own deductions and conclusions: Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729; Noonan Estate, 361 Pa. 26, 63 A. 2d 80; Payne v. Winters, 366 Pa. 299, 77 A. 2d 407; Smith v. Smith, 364 Pa. 1, 70 A. 2d 630.': Kalyvas v. Kalyvas, 371 Pa. 371, 375-376, 89 A. 2d 819."

It is clear, therefore, that this Court has the unrestricted power to determine the legal effect (a) of the written contract made and executed by Chadrow and his niece and (b) of the acts and conduct of the parties; and the interpretation and conclusion reached by the lower Court is in no wise binding upon us.

Although we shall hereinafter demonstrate that the principles applicable to the usual or ordinary inter vivos gifts are inapplicable in the present contract case, nevertheless, even under the inter vivos principles laid down by the authorities upon which the majority rely, *this was,* we repeat, *a valid inter vivos gift* by Chadrow to his niece.

The general principles of law *with respect to ordinary* inter vivos gifts are well settled. Mr. Justice, now Chief Justice STERN clearly and ably stated these general principles in *Rynier Estate,* 347 Pa. 471, 474, 32 A. 2d 736: "It is a general rule that 'to constitute a valid gift inter vivos two essential elements must combine: an intention to make the gift then and there, and such an actual or constructive delivery at the same time to the donee as divests the donor of all dominion over the subject, and invests the donee therewith': Reese v. Philadelphia Trust, Safe Deposit & Insurance Co., 218 Pa. 150, 156, 67 A. 124, 126; Henderson v. Hughes, 320 Pa. 124, 126, 182 A. 392, 393; Fitzpatrick v. Fitzpatrick, 346 Pa. 202, 29 A. 2d 790. Of course, the delivery need not be made directly to the beneficiary. The instrument may be placed in the possession of a third person for delivery upon the happening of a specified contingency or event, as, for example, the death of the donor; in such cases not only is the delivery valid, but it will be held to relate back to the time of the initial delivery if that be necessary to effectuate the donor's intention: Stephens v. Huss, 54 Pa. 20; Stephens v. Rinehart, 72 Pa. 434; Gish v. Brown, 171

Pa. 479, 482, 33 A. 60; Levengood v. Bailey, 1 Woodward 275; Wagoner's Estate, 174 Pa. 558, 564, 34 A. 114, 116; Hartman's Estate (No. 2), 320 Pa. 331, 335, 182 A. 232, 233; Chambley v. Rumbaugh, 333 Pa. 319, 322, 323, 5 A. 2d 171, 173. . . ."

The majority opinion holds that this general rule is also applicable to a joint bank account and a joint safe deposit box and then misapplies the rule to the facts of this case. The majority opinion admits, as we have seen, that if one of the two keys to the safe deposit box had been in the *actual* possession of the niece, the gift would have been a valid inter vivos gift, but because the niece had only a constructive possession of the key for which she executed a written receipt, this did not constitute actual possession and consequently the gift failed. The majority have confused delivery with possession and then substituted actual possession for the right to possession or constructive possession. Actual possession is not necessary under any of the authorities: See *Rynier Estate*, 347 Pa. supra. We note parenthetically that there is nothing unusual in one member of a family keeping actual possession of both keys to a joint safe deposit box, especially if one of the joint owners is a woman. A wife, for example, rarely ever wants to keep a key; she often mislays it or can't find it if and when she wants it; and she rarely ever wants to take the trouble to go to the box if she can avoid it.

It is clear, therefore, under all of the authorities relied upon by the majority that there was (1) an intention by Chadrow to make a gift of a joint interest in the contents of the safe deposit box then and there, and (2) a constructive delivery of the key to the safe deposit box; and consequently Chadrow's niece was immediately vested with an absolute joint ownership of the contents of this safe deposit box.

This opinion would be stopped at this point were it not for the fact that we are convinced that a careful consideration of the principles which are really applicable to the facts in this case will demonstrate beyond the shadow of a doubt that Chadrow's niece was vested as soon as she executed the contract in question with an absolute joint ownership of the contents of the safe deposit box. In order to demonstrate this it seems advisable to analyze and point out the further errors into which the majority has fallen.

While the general rule with respect to an ordinary inter vivos gift is clear and well settled, the applicability of such rule to an inter vivos gift of *an interest,* and especially of a *joint interest,* in a bank account or in a safe deposit box or its contents has rarely, if ever, been carefully analyzed in this state; nor has the fundamental difference between such a gift and an ordinary gift been carefully considered. This is apparent from the majority opinion. How, for example, can a depositor or donor make *a valid delivery* in those cases in which he already has a bank account or a safe deposit box in his own name, and wishes to create in praesenti a *joint interest* and divest himself of *all* dominion over the subject of the gift? Contrary to the majority opinion, it is absolutely impossible to divest the donor of *all* dominion (and control) and invest the donee with *complete* dominion (and control) over a joint account or joint box or interest, and still have each party possess a joint dominion and control. There is little or no difficulty with respect to intention; but with respect to the relinquishment of *all* dominion over a *joint* bank account or a *joint* safe deposit box, such a divestiture (and the investing of complete dominion in the donee) is, upon careful analysis, *a contradiction in terms and an impossibility.* Yet the ma-

jority assert that that is the proper test or rule in these cases.

The majority next attempt, without any foundation in the cases or any reason or logic, to draw a distinction between an inter vivos gift of a joint bank account and an inter vivos gift of a joint safe deposit box. This is obviously a distinction without a difference—the same essential requisites of an intention to make a present gift and a delivery, actual or constructive, necessarily apply to both.

The majority opinion admits that "Where a depositor in a bank, however, adds the name of and executes an agreement with a donee, under which either might draw from the fund, in whole or in part, and the agreement contains *words of an absolute transfer and gift* and provides that upon the death of either the survivor becomes the sole owner, such transaction constitutes a valid inter vivos gift." We certainly agree with this statement of the law; and since the same principles of law apply, as they necessarily must, to a joint safe deposit box as well as to a joint bank account, it follows that Jennie Kellman was unquestionably vested immediately with a valid inter vivos gift.

The majority, in attempting to show a material difference in such cases, says: "In such case [a joint bank account] the delivery is actually made *since the donee may forthwith withdraw the fund* [citing six cases which we shall hereafter discuss, all of which support the majority's conclusion but none of which supports its reasoning]." The majority opinion has confused cause and effect; it has confused the fact of delivery with the effect of delivery, and has assumed the fact of delivery from the effect which would result if a delivery had actually been made. The legal result, namely, that the donee may forthwith withdraw the fund *if*

an actual or constructive delivery with intent to create a present gift had been made, of course, does not prove that a delivery was made.

But this specious reasoning, plus the fundamental nature of a *joint* interest, does show that the inter vivos gift of a *joint* interest in a bank account, or in a safe deposit box, or in the contents thereof, should be governed by a different or modified rule or yardstick from that which is applicable to ordinary inter vivos gifts. Such a modified rule or yardstick would require the divestiture by the donor, not of *all* dominion and control over (his interest in) a joint bank account or safe deposit box or its contents, nor the investing in the donee of *all* dominion and control over the subject matter of the gift, but merely the divestiture by donor and the investiture in the donee *of so much dominion and control as is consonant with a joint ownership,* title or interest in the subject matter of the gift. It is obvious that under this more appropriate and accurate yardstick Jennie Kellman immediately acquired a valid title or *joint* interest, title and ownership in the contents of this safe deposit box.

The lower Court concluded, and the majority implies, that Chadrow's gift was intended (although ineffectually so) to be a gift mortis causa. It is clear that that was never Chadrow's intention. If Chadrow merely wished, as the majority assume, to give the contents of the safe deposit box to his niece at his death, why didn't he do so by will? If that was his intent, why did he take all the time, trouble and effort to go to the bank, take his niece with him, and have them both execute a written agreement, not merely that either should be permitted access to the box, but that *"each of the undersigned is the joint owner* of the present and future contents of said box?" Are those words meaningless; are all the actions of the donor

in making this absolute gift and executing this clear agreement meaningless; what is the use of having clear written agreements if the Courts may still say they are meaningless? Moreover, if, as the majority assert, Chadrow did not wish his niece to have access to the box, why did he have her sign a receipt for the key? And if he did not want her to have the contents of the box until after his death, why did he sign an agreement giving her a *present* title thereto and specifically say therein that she *is* the joint owner of the present and future contents of the box? Moreover, he could not have intended her to have a right of access merely for his convenience because (a) he could have given her a right of access without making her a joint owner of the contents of the box, and (b) he never made any statement of such an intention (for his convenience), and he never once asked her in his lifetime to get him any of the contents of the box. It is clear as crystal that Chadrow wanted and intended to make his niece the joint owner of the contents of the safe deposit box. *His oral statements at the time of the gift showed this, his actions showed this, and most important of all, the joint tenancy agreement which he and his niece signed expressly, specifically, clearly, unambiguously and unequivocally stated this!*

### The Contract.

That brings us to the basic fallacy of the majority opinion. This is not a so-called gift-case; this is a contract-case. The majority has completely overlooked the fact (1) that delivery is not always necessary to validate a gift which is made and intended to take effect in the donor's lifetime—for example, a declaration of trust, or a deed of trust where the donor is the sole trustee, or, as here, an agreement executed by both parties; and (2) that where an agreement involving a gift is executed by both parties it is, of course, to be

interpreted and governed by the principles of contract law.

Chadrow and his niece, Jennie Kellman, entered into and executed a written agreement—a clear and unambiguous written agreement that said: "each of the undersigned *is the joint owner* of the present and future contents of said box and that in the event of death of any (or either) . . . the survivor shall have the right to withdraw said contents . . ."—and all our authorities demonstrate that that agreement is to be governed and interpreted by principles of contract law and not by the principles applicable in ordinary gift cases.

The present case is ruled in principle by *Furjanick Estate,* 375 Pa. 484, 485-490, 100 A. 2d 85, where the facts were almost on all fours with those in the instant case. In that case we sustained a contract which was almost identical with the instant contract. There Pit Furjanick, an unmarried man 83 years of age, took his niece, Sue, to his bank where he had *in his own name* a savings account and a checking account. The balances in these accounts were transferred at his request to their joint names and they each executed an agreement or so-called "signature card" reading as follows: " 'The undersigned do hereby open a joint deposit account with Union National Bank . . . and agree each with the other and with the said bank that all sums heretofore or hereafter deposited by either or both of said joint depositors, with the said bank to their credit as such joint depositors, . . . are and shall be owned by them jointly, with the right of survivorship . . . .' "

During Pit's lifetime all additional deposits to said account were made by him with his own funds, and all withdrawals were likewise made by him, and no withdrawal was made by his niece. All of the theories, arguments and contentions which were made here were

made and rejected there. In the Court's Opinion we said (pp. 489-490, 491, 493) : "When a depositor creates a joint savings or checking (bank) account with right of survivorship, and a signature card so stating is executed by both parties, these facts are prima facie evidence of a gift inter vivos by the depositor to the other, and of the creation of a joint tenancy with right of survivorship: Fell Estate, 369 Pa. 597, 87 A. 2d 310; Lochinger v. Hanlon, 348 Pa. 29, 33 A. 2d 1; Mader et al. v. Stemler et al., 319 Pa. 374, 179 A. 719. A deposit accompanied by such a writing, but nothing more, is considered so incomplete or equivocal as to permit the admissibility of parol evidence: Fell Estate, 369 Pa., supra; but such evidence in order to prevail must be clear, precise and indubitable: Fell Estate, 369 Pa., supra; Dempsey v. National Bank of Scranton, 359 Pa. 177, 181, 58 A. 2d 14; Mader et al. v. Stemler et al., 319 Pa. 374, 379, 179 A. 719.

". . . This was not a savings or checking account in the name of the depositor in trust for his niece, or a joint savings or checking account with an ambiguous title, or merely a joint savings account with right of survivorship. Nor was this a case of a bank account or trust created by fraud, accident or mistake, or undue influence; nor was the agreement permeated with uncertainty or ambiguity.

"When Furjanick opened a new savings account and checking account in the joint names of himself and his niece and then he and his niece signed the aforesaid written agreement setting forth in detail the terms of the contract and the rights of the respective parties therein, the money in those accounts was thereafter owned and held in exact accordance with the terms and provisions of that agreement. This was a complete and detailed agreement . . . . We have repeatedly said and we reiterate that we intend to uphold the integrity of

written instruments and will not permit the Parol Evidence Rule to be circumvented or undermined. . . .

"The question in this class of case ofttimes depends upon the exact wording of the deposit account and the card or agreement accompanying it. Do they clearly show the intention of the depositor, settlor, or contractor? If his intent is uncertain or ambiguous, parol evidence is admissible; if the writings clearly show an intent to make an absolute gift, or an irrevocable trust, or a specific and complete agreement between the parties, then in the absence of fraud, accident or mistake no subsequent acts or declarations of the donor or settlor or contractor can change or revoke or annul the gift, or trust, or contract, without the consent of the other party."

That case, we repeat, rules and governs the present case and holds that where both parties execute a written unambiguous contract which specifies the rights or title or ownership or interest of the parties in a joint bank account, the money in that account is thereafter to be owned and held in exact accordance with the terms and provisions of that agreement.

*Mader et al. v. Stemler et al.*, 319 Pa. 374, 179 A. 719, is likewise directly in point and rules the present case in favor of the niece. The Court, speaking through Mr. Justice LINN, said (pp. 378-379): "No. 9, appeal of Jean Stemler, raises a different question, it is: What was the effect of the agreement prepared by the bank and signed by both parties on December 7, 1926, in the circumstances shown? It may again be repeated: 'The sums deposited in this account belong to Frank Stemler and Jean Stemler jointly, it being understood each may withdraw upon his or her or their individual order during joint lives, and we hereby direct and authorize the Camp Curtin Trust Company, Harrisburg, Pa., to pay any balance remaining upon the death of either

of us, to the survivor.' Certain results were undoubted. The bank agreed to pay the deposit to either on demand. Its obligation was a chose in action. As between him and his daughter, Stemler transferred to her an interest in the chose—an interest in the right to receive payment from the bank; he expressed his donative purpose; as part of the evidence of intention, he executed and delivered the agreement creating a joint interest with the right of survivorship. They agreed that 'the sums deposited . . . belong to . . . [them] . . . jointly'; they provided that either might withdraw the money during their joint lives, and the survivor, on the death of either. An interest as joint owner was transferred, as appears from the statement that 'the sums . . . belong to . . . [them] . . . jointly'; it was not merely a power to collect (as to which, see Flanagan v. Nash, supra; Zellner's Est., supra). When, therefore, after Stemler's death, the bank paid the money to Jean Stemler, it discharged its obligation by paying to the survivor in accordance with the contract made by the bank and the depositors. On the main question, the learned chancellor thought the case was similar in fact to Flanagan v. Nash, supra, and Grady v. Sheehan, 256 Pa. 377, 100 A. 950, in which it was held that the evidence was insufficient to establish title to the fund as a gift inter vivos. In neither of those cases was there, as in appeal No. 9, *a writing signed by the parties, completely expressing the intention to vest by assignment a present joint interest in the chose in action with the right of survivorship.** This distinction was noted in Mardis v. Steen, supra; Crist's Est., supra, 580; Gallagher's Est., supra, 311."

*Mardis, Admrx. v. Steen,* 293 Pa. 13, 141 A. 629, is likewise on all fours with the present case and sus-

---

* Italics, ours.

tains the gift to Chadrow's niece. In that case Mardis deposited in the bank the sum of $2,798. and he and the claimant, Florence M. Steen, signed the following signature card: "It is agreed and understood that any and all sums that may from time to time stand on this account, to the credit of the undersigned depositors, shall be taken and deemed to belong to them as joint tenants and not as tenants in common; and in case of the death of either, the First National Bank is hereby authorized and directed to deal with the survivor as sole and absolute owner thereof.

"Witness our hands and seals this 30 day of May, 1924.

Attest: F. Floyd Askin

F. Floyd Askin.

B. F. Morgan (Seal)

Florence M. Steen (Seal)."

The Court said (pp. 15-16, 18): "It seems to be conceded, and is so assumed in the opinion of the court below, that the fund in question belonged to Mardis, and the argument on behalf of appellant is based on the theory that nothing was done by Mardis which divested him of the control and dominion over the property, but that he at all times retained such title thereto as to preclude any theory of a gift inter vivos. It is familiar law that to establish a gift inter vivos there must be an actual delivery of the subject-matter of the gift, such as to vest a present title in the donee. Where manual delivery is not practicable, a transfer may be made by assignment or by other writing or token which will indicate a present intention to pass right of possession to the donee. Whether there was sufficient proof of a transfer of possession in this case so as to vest title in defendant as survivor, must depend upon the construction of the writing on the signature card accompanying the bank deposit. . . .

"In the present case we have, in addition to the fact of a joint account being opened, an express agreement creating a joint tenancy, and authorizing and directing the bank to deal with the survivor 'as sole and absolute owner thereof.' . . . Whether we view the transaction as a gift or as the creation of a joint ownership based on a valid consideration, it is an agreement which, under the decisions above mentioned, the parties had a right to make, and the language used in the memorandum accompanying the deposit expresses with sufficient clarity the intention to create a joint tenancy with right of survivorship."

Another case approved by the majority opinion is likewise an authority in behalf of the niece, Jennie Kellman: *Reap, Exr. v. Wyoming Valley Trust Co.,* 300 Pa. 156, 150 A. 465. In that case the testatrix had a savings fund account in her own name in a trust company. Five years later she wrote them as follows: "Please add Miss Catherine Reap name on my deposit book No. 12782 and make the account to read: Money payable to either or the survivor of them." Catherine Reap did not sign the letter nor any agreement. The trust company then made the account payable to Mary Gilligan or Catherine Reap, either or survivor. The Court decided in favor of Catherine Reap and rejected the contention that there was no delivery to support a gift inter vivos, and in its opinion said (p. 158) : "In the present case we have the written declaration of Mary Gilligan that her sister Catherine was to have a joint interest in the account and that the money deposited therein was to be payable to either of them, and we have in evidence the fact that the account was maintained under this arrangement until Mary Gilligan's death, a period of more than three years. While the record does not expressly show acceptance of the arrangement by Catherine Reap, yet, under the cir-

cumstances, acceptance may be presumed: Sparks v. Hurley, 208 Pa. 166, 172." The facts to evidence an inter vivos gift were not nearly as strong as in the present case.

In *Culhane's Estate*, 334 Pa. 124, 5 A. 2d 377, Mr. Justice LINN, speaking for the Court, again sustained as a valid inter vivos gift a joint tenancy in a bank account where the parties signed the following card: " 'We . . . hereby declare that we are the joint owners in joint tenancy of the money that is now or may hereafter be deposited in the Erie Trust Company in our names . . . and that either of us may draw and receipt for the whole or any part thereof, . . . and that at the death of either of us the survivor shall be the absolute owner of the balance. . .' ".

Similarly, in *Fell Estate*, 369 Pa. 597, 87 A. 2d 310, this Court again sustained under familiar principles of contract law a gift of a bank account where a signature card was signed by both donor and donee. The Court said (p. 600) : "Where the depositor and some one else execute an agreement that the bank account shall belong to both of them as joint tenants, subject to the check of either of them, and in the case of death of one, the bank shall deal with the survivor as sole and absolute owner, the agreement is prima facie evidence of a gift inter vivos by the depositor to the other and of the creation of a joint tenancy with the right of survivorship. Lochinger v. Hanlon, 348 Pa. 29, 33 A. 2d 1; Glessner v. Security-Peoples Trust Co., 166 Pa. Superior Ct. 566, 72 A. 2d 817; Culhane's Estate, 133 Pa. Superior Ct. 339, 2 A. 2d 567."

Still another case which in principle rules the instant case is *Fuller v. Fuller*, 372 Pa. 239, 93 A. 2d 462. In that case the mother died at the age of 92, leaving two sons. Several years before her death she transferred from her individual bank account approximately

$10,000. to the joint names of herself and her son Lawrence, both of whom signed a signature card, which provided (p. 242) : ". . . that the sums held in the joint account should belong to them as joint tenants and not as tenants in common, checks for orders against which might be drawn by each of them. . . . 'In case of the death of any of the undersigned, the balance in the joint account shall belong to the survivors or survivor, . . . as sole and absolute owners or owner thereof.' " The Court sustained the contract and awarded the money to the son as survivor. After quoting with approval from *Mader v. Stemler,* 319 Pa., supra, the Court said (p. 250) : "In Cochrane's Estate, 342 Pa. 108, 20 A. 2d 305, in referring to agreements creating joint accounts with provisions identical with those involved here, we said: '. . . They [the agreements] created the relationship of joint tenants between the parties which, of itself gave each an equal interest in the fund.' . . . Even where one contributes the entire sum to a joint bank account, the rights of each of the tenants to the joint fund are the same, the one who made the contribution has by that act made an immediate gift to the other: Mader v. Stemler, 319 Pa. 374, 179 A. 719; Culhane's Est., 133 Pa. Superior Ct. 339, 2 A. 2d 567, affirmed by us, 334 Pa. 124, 5 A. 2d 377. . . .".

It is, we believe, clear from the foregoing authorities that a present and immediate joint ownership of the contents of the box was created by the contract of Chadrow and his niece; and no question of delivery such as arises in the ordinary inter vivos gift cases arises under such a contract.

One other point remains to be considered. The majority opinion relies upon and considers "most significant" the testimony of a bank vault custodian that a year and a half after the contract was made and executed by Chadrow and his niece (Jennie Kellman),

Chadrow came to the vault and inquired how he could return the box to his own name. The custodian told him, as if this could bind a Court or defeat a donee's vested right, that the only way to accomplish this was to surrender the old box and open a new one, and that since he possessed both keys no one except himself could gain entry. Chadrow thereupon decided to wait and never changed the box.

Assuming that the statements of a custodian in a safe deposit department of a bank relative to Chadrow's desire to change the deposit box into his own name—a desire which he expressed a year and a half after the contract was executed, but which he never carried out—were relevant, competent and admissible evidence, they were legally ineffective to vary or destroy the written contract in this case or to defeat Jennie Kellman's rights which had vested a year and a half before the conversation between Chadrow and the custodian.

As this Court said in *Furjanick Estate,* 375 Pa. 484, 493: "The question in this class of case ofttimes depends upon the exact wording of the deposit account and the card or agreement accompanying it. . . . If his intent is uncertain or ambiguous, parol evidence is admissible; if the writings clearly show an intent to make an absolute gift, or an irrevocable trust, or a specific and complete agreement between the parties, then in the absence of fraud, accident or mistake *no subsequent acts or declarations of the donor* or settlor or *contractor can change or revoke\** or annul the gift, or trust, or *contract,* without the consent of the other party."

For each and all of these reasons I would hold that Chadrow's niece, Jennie Kellman, was on and after

---

\* Italics, ours.

June 21, 1951, a joint owner of the contents of the safe deposit box with right of survivorship; and I would reverse the decree of the Court below.

Mr. Justice MUSMANNO joins in this dissenting opinion.